UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA CIVIL DIVISION
CASE NUMBER:

ASHTON POIST,
        Plaintiff

v.

UNITED STATES OF AMERICA,
        Defendant
_____/

### SEAMAN'S COMPLAINT FOR DAMAGES

Plaintiff Ashton Poist sues the defendant United States of America for damages and alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff Ashton Poist is an American Seaman and lives in Brandon, Hillsborough County, Florida.

2. On February 20, 2022, Defendant United States of America ("USA") was the owner and operator of the USNS SISLER, a 952-foot roll-on, roll off vessel that is home ported in Diego Garcia.  The vessel in currently in Saipan, Northern Marianna Islands.

3. On February 20, 2022, plaintiff Poist was employed as a seaman and a member of the crew of the USNS SISLER.  His rating/rank was that of third mate.

4. Plaintiff joined the ship on February 12, 2022, in Norway.

5. This case is brought against the defendant USA under the Public Vessels Act, 46 U.S.C. § 31101, et seq.

6. Venue is proper in the Middle District of Florida as the vessel is currently overseas and the plaintiff resides in the Middle District of Florida.

7. On February 20, 2022, the ship was in port in the city of Hammarnesodden, Norway, the chief mate of the ship was having to change the location of various pieces of cargo to correct the metacentric height (GM) of the ship because some of the ship's other cargo was moved.

8. Some of the cargo that had to be moved were Humvees.

9. Before the Humvees could be moved, the batteries which had been disconnected had to be re-connected. Re-connecting the batteries would allow the Humvees to be repositioned (by driving them) on the ship to correct the ship's stability.

10. Personnel aboard the ship who were reconnecting the battery cables to the batteries of the Humvees to allow them to be moved, re-connected the battery cables incorrectly on one Humvee on "B" deck of the ship. This incorrect re-attachment of the battery cables (or in the alternative the incorrect disconnecting of the cables when originally stowed) caused the batteries on that one Humvee on B deck to catch on fire in its engine compartment.

11. Plaintiff, who was a mate on watch, was contacted and notified that there was a Humvee on fire on B deck. Plaintiff then ran from G deck to B deck to investigate the claim that there was a fire on B deck.

12. The ship's fire main system had been drained of water and was not pressurized because the water in the fire main would freeze and potentially break the lines in the

fire main. Therefore, the fire main was drained and shut down due to the freezing weather in Norway where the ship was located.

13. When the plaintiff arrived at B deck, he found that there was black smoke already up to his chest level. Plaintiff grabbed a fire extinguisher off the wall to be used to fight and attempt to extinguish the fire located at the one Humvee.

14. Plaintiff, on his ship's radio began broadcasting that there was a fire on B deck and alerted that the general alarm should be sounded. The general alarm on a merchant ship is an alarm that is sounded, usually from the navigation bridge, that alerts the crew throughout the ship of an emergency situation such as fire, a collision or that another life-threatening event has occurred.

15. The general alarm was sounded throughout the ship due to the heavy smoke being detected and setting off the alarm.

16. The captain of the ship then improperly and without fully investigating the circumstances of the sounding of the general alarm, caused the general alarm of the USNS SISLER to be silenced or turned off so that it was no longer sounding throughout the ship.

17. Plaintiff as the mate on watch and immediately on the scene of the fire kept trying to reach the captain or other individual via the ship's radio to continue to alert the rest of the ship's crew to the raging fire on B deck, but the captain improperly kept the "talk" button on his radio depressed so no other crew could talk via the radio. This action by the captain prevented the ship's fire crew from being properly alerted to the raging fire on B deck which would have caused the fire team to put on firefighting gear to be able to fight the fire promptly and properly.

18. At this point the fire was raging, and the flames were reaching the ceiling or top of B deck. At this point one Humvee was on fire. The flames were rolling. The thick black smoke was up to the level of plaintiff's knees at this time.

19. Plaintiff was able to use a fire extinguisher to beat down the engine fire. The plaintiff was at this time spraying the deck or floor of B deck that had also caught on fire. The engine compartment of the Humvee kept re-flashing. Plaintiff kept sweeping the engine bay and deck with the fire extinguisher he was using to prevent other adjacent vehicles from catching on fire. Plaintiff was trying desperately to stop the fire from spreading on B deck due to the fact that less that forty-five feet from the fire were located fourteen (14) long tons of white phosphorous rounds that were extremely flammable. On the deck below was various forms of ammunition that would have exploded and placed the entire ship in peril if the fire spread.

20. During the time that the plaintiff was fighting the fire on B deck he was engulfed in the black smoke that was coming from the fire. Plaintiff was having a difficult time breathing during the time he was fighting the fire due to the smoke, heat and flames created by the fire. Plaintiff was also breathing in burning diesel fumes and CARC fumes from the Humvee fire in an enclosed space that had no ventilation.

21. Due to the inability to contact the rest of the crew and the captain shutting off the ship's general alarm, the fire team showed up ten to fifteen minutes after the plaintiff had extinguished the fire, but at great cost to himself by having to fight the fire without the proper men, gear or equipment.

22. As a direct and proximate result of the plaintiff having to fight the fire without the aid of the fire team and its firefighting gear, plaintiff was injured in that he burned his

upper esophagus and breathed black smoke and fumes into his lungs. This has caused plaintiff to suffer from a loss of breath, loss of stamina, have a raspy voice, and have to take doctor prescribed medicine to attempt to control his symptoms. Plaintiff has developed a chronic cough, severe persistent asthma and has developed partial volumetric loss of lung function of the lingula including scarring as a direct result of the fire aboard the USNS SISLER.

## COUNT ONE-NEGLIGENCE UNDER THE JONES ACT

Plaintiff repeats and re-alleges paragraphs 1 through 22 above and further alleges:

23. At all material times herein, Plaintiff was a seaman employed, by defendant USA in the capacity of a third mate aboard the USNS SISLER.

24. Plaintiff brings a claim against the USA pursuant to 46 U.S.C. § 30104 commonly known as the Jones Act.

25. Plaintiff's employer had the duty to provide him with a safe place to work, safe equipment and tools to do his job, a seaworthy vessel and crew, provide him and other crewmembers proper training, supervision and assistance while completing his work. The employer also had the duty to provide enough properly trained crew and proper equipment to safely fight any fires that would arise on the ship.

26. On February 20, 2022, Plaintiff was injured when he was forced to fight a fire that erupted and began to spread on the B deck of the ship. Plaintiff properly radioed for the sounding of the general alarm due to the fire on B deck. The general alarm was sounding, and the captain silenced the general alarm. It was the captain's responsibility and duty to investigate the reason for the sounding of the general alarm and direct an appropriate response for the safety of the ship and its crew.

27. Plaintiff was injured due to the negligence of the USA and its captain, officers and crew members.

28. The USA through its captain and crew was negligent in:

   a. Failure to supervise, instruct and train vessel personnel in firefighting operations including but not limited to have a fire team respond promptly to a general alarm and attempt to assist extinguish the fire.

   b. Failure to have and follow proper procedures for advising when a sounding of the general alarm is a real emergency or just a drill.

   c. Failure to have a crewmember promptly investigate the reason for sounding the general alarm before shutting the alarm off.

   d. Failure to promptly call for the fire team to be assembled to help fight the fire on B deck.

   e. Failure to make sure the batteries on the Humvees were being re-connected properly and safely before having the vehicles started and moved.

   f. Failure to alert the crew that there would be vehicles moved in the decks of the ship and that the fire team should be on "standby" in case needed.

   g. Failure to start the fire main and have the fire main system up and running before and during the time when the vehicles batteries were going to be hooked up and driven inside the vessel to correct the GM.

   h. Failure to make sure there were enough crew for the job with sufficient experience and with proper training for the specific operation of re-hooking up of the batteries and repositioning the vehicles.

 i. Failure to inform plaintiff and crew of how the hooking up of the batteries and the movement of the vehicles was going to take place to correct the GM of the ship on the day of the fire (have a proper safety meeting or pre-evolution meeting or job hazard analysis).

 j. Failure to have a proper and adequate vessel Safety Management System relative to the operations, hazards, and risks to which plaintiff was exposed.

 k. Failure to have outfitted the USNS SISLER with equipment, gear and riggings suitable for the operation conducted at the time of plaintiff's injury.

 l. Failing to have provided plaintiff with proper warnings as to the hazards and risks relating to the operation conducted at the time of plaintiff's injury.

 m.  Failing to comply with applicable Coast Guard, OSHA safety regulations and proper standards of marine practices.

 n. Failing to make sure the Humvee wires were properly disconnected when the vehicles were placed aboard B deck.

 o. In other particulars to be obtained during discovery and presented at trial.

29. As a result of the USA's negligence, the fire started, got larger in size with his limited ability to fight a raging vehicle fire, plaintiff was forced to fight the fire without the assistance of the ship's fire team and the team's firefighting gear, and was injured.

30. As a result of the injuries, plaintiff has incurred medical expenses, loss of earnings, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life and will incur future loss of earnings/earning potential, loss of found, future medical expenses and future pain and suffering disability, disfigurement, mental anguish, and loss of capacity for the enjoyment of life.  Plaintiff has sustained a

permanent injury to his lungs and airway which will impact his ability to work as a merchant seaman and other employment in the future.

WHEREFORE, Plaintiff, Ashton Poist, demands judgement for damages against Defendant, United States of America for compensatory damages in excess of Five Million Dollars ($5,000,000.00), prejudgment interest, post-judgement interest and costs.

## COUNT II – UNSEAWORTHINESS CLAIM AGAINST THE UNITED STATES OF AMERICA

Plaintiff repeats and realleges the allegations set forth in paragraphs 1 to 22 and further alleges:

31. Defendant USA had a duty to provide plaintiff with a seaworthy vessel and crew. That means that the ship and its crew must be fit for their intended purpose.

32. Plaintiff brings a claim for unseaworthiness for breaching its duty to provide plaintiff with a seaworthy vessel and crew.

33. On February 20, 2022, plaintiff was injured when he was forced to fight a fire that erupted and began to spread on the B deck of the ship. Plaintiff properly radioed for the sounding of the general alarm due to the fire on B deck. The general alarm was sounding, and the captain silenced the general alarm. It was the captain's responsibility and duty to investigate the reason for the sounding of the general alarm and direct an appropriate response for the safety of the ship and its crew.

34. Plaintiff was injured due to the unseaworthiness of the USNS SISLER and her crew.

35. The USNS SISLER and its crew was unseaworthy as follows:

    a. Failure to supervise, instruct and train vessel personnel in firefighting operations including but not limited to have a fire team respond promptly to a general alarm and attempt to assist extinguish the fire.

b.  Failure to have and follow proper procedures for advising when a sounding of the general alarm is a real emergency or just a drill.

c.  Failure to have a crewmember promptly investigate the reason for sounding the general alarm before shutting the alarm off.

d.  Failure to promptly call for the fire team to be assembled to help fight the fire on B deck.

e.  Failure to make sure the batteries on the Humvees were being re-connected properly and safely before having the vehicles started and moved.

f.  Failure to alert the crew that there would be vehicles moved in the decks of the ship and that the fire team should be on "standby" in case needed.

g.  Failure to start the fire main and have the fire main system up and running before and during the time when the vehicles batteries were going to be hooked up and driven inside the vessel to correct the GM.

h.  Failure to make sure there were enough crew for the job with sufficient experience and with proper training for the specific operation of re-hooking up of the batteries and repositioning the vehicles.

i.  Failure to inform plaintiff and crew of how the hooking up of the batteries and the movement of the vehicles was going to take place to correct the GM of the ship on the day of the fire (have a proper safety meeting or pre-evolution meeting or job hazard analysis).

j.  Failure to have a proper and adequate vessel Safety Management System relative to the operations, hazards, and risks to which plaintiff was exposed.

k. Failure to have outfitted the USNS SISLER with equipment, gear and riggings suitable for the operation conducted at the time of plaintiff's injury.

l. Failing to have provided plaintiff with proper warnings as to the hazards and risks relating to the operation conducted at the time of plaintiff's injury.

m. Failing to comply with applicable Coast Guard, OSHA safety regulations and proper standards of marine practices.

n. Failing to make sure the Humvee wires were properly disconnected when the vehicles were placed aboard B deck.

o. In other particulars to be obtained during discovery and presented at trial.

36. As a result of the unseaworthiness of the USNS SISLER and her crew, the fire started, got larger in size with his limited ability to fight a raging vehicle fire, plaintiff was forced to fight the fire without the assistance of the ship's fire team and the team's firefighting gear, and was injured.

37. As a result of the injuries, Plaintiff has incurred medical expenses, loss of earnings, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life and will incur future loss of earnings/earning potential, loss of found, future medical expenses, future pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life. Plaintiff has sustained a permanent injury to his lungs and airway which will impact his ability to work as a merchant seaman and other employment in the future.

WHEREFORE, Plaintiff, Ashton Poist, demands judgement for damages against Defendant USA for compensatory damages in excess of Five Million Dollars ($5,000,000.00), prejudgment interest, post-judgement interest and costs.

/s/ JACOB J. MUNCH
Jacob Munch
Florida Bar Number 376523
Email: jake@munchandmunch.com
CATHERINE M. SAYLOR
Florida Bar Number 115593
Email: casey@munchandmunch.com
MUNCH & MUNCH, PA
600 South Magnolia Avenue, Suite 325
Tampa, Fl. 33606
Phone: 813.254.1557